**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**JIN ZHAO CHI, a/k/a A Chi LU,**<br>**a/k/a A Chi,**<br><br>***Defendant.*** | **Case No. CR-26-066-RAW** |

**UNITED STATES' BRIEF IN SUPPORT OF ITS RESPONSE TO DEFENDANT JIN ZHAO CHI'S MOTION TO SUPPRESS STATEMENTS (DOC. 39)**

Respectfully submitted,

CHRISTOPHER J. WILSON
United States Attorney

s/ *T. Cameron McEwen*

T. CAMERON MCEWEN
AL BAR # 7161-R67M
Assistant United States Attorney
520 South Denison
Muskogee, OK 74401
Telephone: (918) 684-5100
Fax: (918) 684-5150
Cameron.McEwen@usdoj.gov

# TABLE OF CONTENTS

GOVERNMENT'S OBJECTION TO DEFENDANT'S MOTION……………………….....…….1

PROCEDURAL HISTORY……………………………………………………...…..…………….1

FACTS AND EVIDENCE ELICITED AT SUPPRESSION HEARING ……………………..……..1

*Special Agent Kimberly Bahney's Testimony* ……………………..…………………...1

*Special Agent Christopher Overhauser's Testimony*……………………………………...5

*Christian Beals' Testimony*…………………………………………………………10

*Joseph Christian Hull, II's Testimony*…………………………………………….....11

*Special Agent Sherita Holden's Testimony*…………………………………………12

*Special Agent Raquel Valezquez's Testimony*………………………………………13

*Defendant Jin Zhao Chi's Testimony*………………………………………………14

ARGUMENTS AND AUTHORITIES……………………………………...……………...17

CONCLUSION……………………………………………………………..………..…..24

CERTIFICATE OF SERVICE ……………………………………………………………..25

# TABLE OF AUTHORITIES

**Cases**

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ... 17, 18, 20

*California v. Beheler*, 463 U.S. 1121 (1983) ... 19, 20

*Harris v. New York*, 401 U.S. 222 (1971) ... 24

*Miranda v. Arizona*, 384 U.S. 436 (1966) ... 17

*United States v. Brannon*, 2014 WL 12789706, *1 (D.N.M. July 22, 2014) ... 22

*United States v. Chee*, 514 F.3d 1106 (10th Cir. 2008) ... 18, 20

*United States v. Dayton*, 622 F.Supp.2d 1109 (N.D. Okla. June 25, 2008) ... 21, 22

*United States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993) ... 19, 21

*United States v. Guillen*, 995 F.3d 1095 (10th Cir. 2021) ... 18, 19, 20

*United States v. Haymond*, 2010 WL 11508830, *1 (N.D. Okla. January 15, 2010) ... 21

*United States v. Jones*, 523 F.3d 1235 (10th Cir. 2008) ... 18, 19, 21

*United States v. Kuhn*, 809 F.Supp.3d 326 (E.D.N.C. November 17, 2025) ... 22

*United States v. Lamy*, 521 F.3d 1257 (10th Cir. 2008) ... 20

*United States v. Nahkai*, 139 F.4th 859 (10th Cir. 2025) ... 17, 18, 19, 20, 21

*United States v. Rogers*, 391 F.3d 1165 (10th Cir. 2004) ... 17, 21

*United States v. Simmonds*, 641 F. App'x 99, 103 (2d Cir. 2016) ... 19

*United States v. Vallejos*, 2025 WL 1950187, *1 (10th Cir. 2025) ... 22

*United States v. Wagner*, 951 F.3d 1232 (10th Cir. 2020) ... 20, 22

**Statutes**

18 U.S.C. § 371 ... 1

18 U.S.C. §§ 545 and 2 ... 1

7 U.S.C. §§ 136j(a)(1)(A) .......... 1

7 U.S.C. §§ 136l(b)(1)(B) .......... 1

**UNITED STATES' BRIEF IN SUPPORT OF ITS RESPONSE TO DEFENDANT JIN ZHAO CHI'S MOTION TO SUPPRESS STATEMENTS (DOC. 39)**

Comes now the United States of America, by and through United States Attorney Christopher J. Wilson and Assistant United States Attorney T. Cameron McEwen for the Eastern District of Oklahoma, and respectfully requests the Court deny the Defendant's Motion to Suppress Statements (Doc. 39).

## I. PROCEDURAL HISTORY

On May 12, 2026, the Defendant was indicted by a federal grand jury for Conspiracy to Smuggle Goods into the United States, in violation of 18 U.S.C. § 371 (Count One); Smuggling Goods into the United States, in violation of 18 U.S.C. §§ 545 and 2 (Count Two); and Unlawful Distribution and Sale of Pesticides – Misdemeanor, in violation of 7 U.S.C. §§ 136j(a)(1)(A) and 136l(b)(1)(B) (Count Three). *See* Doc. 2. On July 14, 2026, the Defendant filed a Motion to Suppress Statements ("Motion") (Doc. 39). On July 21, 2026, the United States filed its response to the Defendant's Motion (Doc. 44). On September 3 and 18, 2026, a suppression hearing was held on the matter before United States Magistrate Judge D. Edward Snow. *See* Docs. 64 and 69. The hearing consisted of two witnesses for the United States and five witness for the Defendant along with numerous exhibits admitted by both parties. *Id*. At the conclusion of the witnesses' testimonies, Magistrate Judge Snow ordered the parties to brief the suppression issue with supporting facts stemming solely from the testimony of witnesses and admitted exhibits at the suppression hearing. *Id*.

## II. FACTS AND EVIDENCE ELICITED AT SUPPRESSION HEARING

*Special Agent Kimberly Bahney's Testimony*

Special Agent Kimberly Bahney ("SA Bahney") has been with the Environmental Protection Agency ("EPA") for 23 years, including 18 years as a special agent investigating

criminal matters. *See* Suppression Hearing Transcript, Vol. I, pg. 12, lines 10-25. She is currently the Special Agent in Charge for the EPA's Region 6, which covers Oklahoma, Texas, Arkansas, Louisiana, New Mexico, and the tribal territories within those states. *See id.* at pgs. 12, lines 20-25, and pg. 13, lines 1-3. SA Bahney has extensive training in conducting search warrants and interviews of witnesses and suspects. *See id.* at pg. 13, lines 6-12, and pg. 14, lines 1-9. She has conducted and oversaw over 20 search warrants during her career as a special agent as well as over 20 as a supervisor. *See id.* at pg. 13, lines 13-25. Also, in her career, she has conducted more than 200 interviews with witnesses and suspects of crimes. *See id.* at pg. 14, lines 10-13.

On March 19, 2025, SA Bahney was present for the execution of the search warrant at 11985 NS 3580, Seminole, Oklahoma. *See id.* at pg. 14, lines 19-24. Significant planning went into the execution of the search warrant due to the size of the property, the number of buildings on the property, and all the unknowns of the property. *See id.* at pg. 14, line 25, pg. 15, lines 1-25, and pg. 16, lines 1-4; Government's Suppression Hearing Exhibits 1-2 and 35-37. There were between 20-30 armed and unarmed law enforcement officers on site during the execution of the search warrant, including several unarmed officers who collected forensic evidence. *See* Suppression Hearing Transcript, Vol. I, pg. 16, lines 6-25, pg. 17, lines 1-3, pg. 57, lines 5-25, and pg. 58, lines 1-9. The reason for so many officers present for the execution of the search warrant was due to the magnitude of the property's size, the number of buildings to be searched, and for the officers' safety. *See id.* at pg. 23, lines 9-22. It was not law enforcement's intent to arrest anybody that day, just to execute the search warrant. *See id.* at pg. 30, lines 12-15, and pg. 58, lines 10-12.

Prior to the execution of the search warrant, law enforcement entered the residence and other buildings on the property in tactical gear, with the intent to clear them for officer's safety,

and with weapons in ready position, meaning that the weapons were in their hands but pointed down and to their side. *See id.* at pg. 24, lines 2-10 and 24-25, pg. 25, lines 1-25, pg. 26, line 1, and pg. 35, lines 1-9; Government's Suppression Hearing Exhibit 32. This was done to ensure that the property was safe, secure, there were no threats, and no one could interfere with the collection of evidence during the execution of the search warrant. *See* Suppression Hearing Transcript, Vol. I, pg. 25, lines 2-12. As the property was cleared, none of the individuals were handcuffed and/or arrested other than two Honduran nationals who were hiding on the property. *See id.* at pg. 29, lines 19-21, pg. 48, lines 8-25, and pg. 58, lines 10-15; Government's Suppression Hearing Exhibits 32-33.

Some of the individuals being cleared from the buildings on the property were escorted, meaning law enforcement would walk with them, and some were sent out and pointed in the direction they should go, including the Defendant. *See* Suppression Hearing Transcript, Vol. I, pg. 29, lines 22-25, pg. 30, lines 1-4, pg. 35, lines 21-24, pg. 36, lines 18-25, pg. 37, lines 1-21, pg. 40, lines 23-25, pg. 41, lines 1-25, and pg. 42, lines 1-11; Government's Suppression Hearing Exhibits 32-33. While escorted, these individuals were not touched, threatened, and no firearms were pointed at them. *See id.* at pg. 30, lines 5-18.

Those that were cleared from the buildings on the property were first led to a berm in front of the residence and asked to sit and/or remain there while the property was being cleared. *See id.* at pg. 31, lines 2-7. Prior to sitting on the berm, law enforcement conducted a pat down of the Defendant for officer's safety. *See id.* at pg. 39, lines 3-25, pg. 40, lines 1-8, and pg. 42, lines 12-24; Government's Suppression Hearing Exhibits 32-33. While at the berm, none of the individuals were handcuffed or restrained in any way, including the Defendant. *See* Suppression Hearing Transcript, Vol. I, pg. 31, lines 8-10, pg. 32, lines 3-17, and pg. 43, lines 5-7; Government's

Suppression Hearing Exhibits 5-18. Also, while at the berm, SA Bahney conversed back and forth with the Defendant in English about getting coats from inside the residence because it was cold outside, including the Defendant explaining where SA Bahney could find the coats, as well as explained to everyone at the berm in English why they were there, asked how many people were onsite, and asked for their phones. *See* Suppression Hearing Transcript, Vol. I, pg. 43, lines 8-25, pg. 44, lines 1-11, pg. 60, lines 23-25, pg. 61, lines 1-25, pg. 62, lines 1-9, pg. 68, lines 19-25, and pg. 69, lines 1-10. SA Bahney was not aware one of the agents at the berm spoke Mandarin until she walked into the residence later that day and heard him speaking it. *See id*. at pg. 68, lines 3-18. The Defendant and others cleared from the property were at the berm for approximately 45 minutes. *See id*. at pg. 44, lines 12-19.

After the berm, the Defendant and the other Chinese nationals went inside the residence's garage located to the right of the breezeway of the residence. *See id*. at pg. 44, lines, 20-25, and pg. 45, lines 1-7; Government's Suppression Hearing Exhibit 34. The garage was not heated, had one entrance and one exit, and there were no chairs in it. *See* Suppression Hearing Transcript, Vol. I, pg. 64, lines 12-20. During this process, as well as while they were in the garage, none of the individuals were handcuffed or physically restrained in any way, including the Defendant. *See* Suppression Hearing Transcript, Vol. I, pg. 45, lines 8-25, pg. 46, lines 1-16, and pg. 47, lines 6-11; Government's Suppression Hearing Exhibits 19-30. In fact, during that entire day, neither the Defendant nor the other Chinese nationals were handcuffed or restrained in any way. *See* Suppression Hearing Transcript, Vol. I, pg. 47, lines 12-17.

To help establish the identity of the Chinese nationals on the property that day, photos were taken of them at the berm and later in the residence's garage holding up a sheet of paper with their name and other identifiers on them. *See id.* at pg. 32, lines 18-25, pg. 33, lines 1-16, pg. 46, lines

19-25, and pg. 47, lines 1-5; Government's Suppression Hearing Exhibits 5-15 and 19-30. Also, approximately 10 individuals were interviewed by law enforcement that day, but only one was mirandized. *See* Suppression Hearing Transcript, Vol. I, pg. 49, lines 19-21, and pg. 50, lines 3-5. According to SA Bahney, it is not customary to read *Miranda* warnings to subjects but it would be the case agent in charge that makes that decision, and the Defendant was not mirandized that day. *See id*. at pg. 66, lines 5-6, and pg. 67, lines 8-9.

*Special Agent Christopher Overhauser's Testimony*

Special Agent Christopher Overhauser ("SA Overhauser") has been a special agent with the EPA's Criminal Investigation Division ("EPA-CID") for 24 years. *See id*. at pg. 73, lines 10-15, and pg. 74, lines 3-4. SA Overhauser has extensive training in conducting search warrants and interviews of witnesses and suspects. *See id*. at pg. 74, lines 8-25, pg. 75, lines 1-4. He has conducted and oversaw over 20 search warrants during his career as a special agent. *See id*. at pg. 75, lines 5-9. Also, in his career, he has conducted hundreds of interviews with witnesses and suspects of crimes. *See id*. at pg. 75, lines 5-17. In these interviews, he did not mirandize individuals that were not under arrest. *See id*. at pg. 75, lines 18-22, pg. 126, lines 3-25, and pg. 127, lines 1-4.

On March 19, 2025, SA Overhauser was present for the execution of the search warrant at 11985 NS 3580, Seminole, Oklahoma. *See id*. at pg. 75, lines 23-25, and pg. 76, lines 1-2. The Defendant lived and worked on the property and had his own room there. *See id*. at pg. 121, lines 19-22; Government's Suppression Hearing Exhibit 31. There was a significant law enforcement present that day with somewhere between 20-30 armed and unarmed law enforcement officers on scene, including at least three officers with assault weapons. *See* Suppression Hearing Transcript, Vol. I, pg. 107, lines 5-23, and pg. 108, lines 21-25. It was also cold that day, and if anyone needed

to use the restroom while the property was being cleared and during the execution of the search warrant, they were escorted by law enforcement. *See id*. at pg. 109, lines 1-4, pg. 110, lines 15-17, pg. 122, lines 19-25, pg. 123, lines 1-21.

During the clearing of the property and execution of the search warrant, his duties and responsibilities were to be a rifle carrier upon entry of the property, conduct an interview of the Defendant, and assist with the search of the premises. *See id*. at pg. 76, lines 3-25, pg. 77, lines 1-3, and pg. 78, lines 1-5; Government's Suppression Hearing Exhibits 31-32. On the day of the search, he wore a ballistic vest and was equipped with a rifle and handgun. *See* Suppression Hearing Transcript, Vol. I, pg. 77, lines 1-10; Government's Suppression Hearing Exhibit 32. At no point that day, did he point his rifle or handgun at anyone. *See id*. at pg. 77, lines 11-13; Government's Suppression Hearing Exhibit 32. Prior to his interview of the Defendant, he stored his rifle in his vehicle but cannot remember if he took off his vest. *See* Suppression Hearing Transcript, Vol. I, pg. 77, lines 14-25, and pg. 78, lines 1-5. However, it is common for him to remove his body armor after clearing a property. *See id*. at pg. 77, lines 21-25. Also, prior to the Defendant's interview, SA Overhauser was aware that the Defendant had no criminal history in the United States, he was not aware of any previous experience where the Defendant would have had his *Miranda* rights read to him, and he had no opinion of the Defendant's educational level. *See id*. at pg. 104, lines 10-25, pg. 105, lines 1-4, and pg. 115, lines 13-24.

The Defendant's interview was conducted in a room just inside the doorway to the left of the breezeway of the residence. *See id*. at pg. 78, lines 18-25; Government's Suppression Hearing Exhibits 34 and 42-43. There were multiple entry and exit points into that room with more than one entry/exit point being open during the interview. *See* Suppression Hearing Transcript, Vol. I, pg. 80, lines 1-25, pg. 81, lines 1-25, and pg. 82, lines 1-11; Government's Suppression Hearing

Exhibits 34 and 40-43. Once in the room, SA Overhauser offered a seat to the Defendant and asked him if he would like to sit in a white folding chair by the window for the interview. *See id.* at pg. 82, lines 12-17, pg. 114, lines 9-15, and pg. 115, lines 5-6; Government's Suppression Hearing Exhibit 42.

Special Agent Raquel Valezquez ("SA Valezquez") with the Oklahoma Bureau of Narcotics ("OBN") assisted SA Overhauser with the interview. *See id.* at pg. 82, lines 18-20; Government's Suppression Hearing Exhibit 31. Special Agent Joseph Hubbard ("SA Hubbard") with EPA-CID was also momentarily involved in the interview. *See id.* at pg. 83, lines 2-13; Government's Suppression Hearing Exhibit 31. SA Overhauser, SA Valezquez, and SA Hubbard did not speak Mandarin, so a translator was used to assist with the interview. *See id.* at pg. 82, lines 21-25, and pg. 83, lines 1-5; Government's Suppression Hearing Exhibit 31. At no point prior to the interview or during the interview was the Defendant mirandized nor did SA Hubbard or anyone else instruct SA Overhauser to mirandize the Defendant. *See id.* at pg. 83, lines 14-20, and pg. 89, lines 9-13; Government's Suppression Hearing Exhibit 31. According to SA Overhauser, this was because he was conducting an investigative interview and did not intend to arrest the Defendant. *See* Suppression Hearing Transcript, Vol. I, pg. 89, lines 9-13, and pg. 115, lines 20-21. Also, throughout the interview, several individuals who were not involved in the interview came in and out of the room as well as a special agent with EPA-CID's National Computer Forensics Lab to briefly ask the Defendant for the password to his cellular phone. *See id.* at pg. 86, lines 23-25, and pg. 87, lines 1-7. The interview room was a common area in the residence. *See id.* at pgs. 127, lines 5-10.

During the Defendant's interview, SA Overhauser was wearing green 511 pants, his duty belt, a black jacket, a drop holster with his handgun in it at his hip, and possibly his ballistic vest.

*See id*. at pg. 83, lines 21-25, pg. 84, lines 1-7. SA Valezquez was wearing a BDU style uniform with a firearm holstered on her hip. *See id*. at pg. 84, lines 8-15. SA Hubbard was wearing 511 style pants, a blue agency shirt, possibly a jacket, and a firearm in his holster. *See id*. at pg. 84, lines 20-25, and pg. 85, lines 1-4. At no point during the interview did any of the three agents have their firearms drawn, pointed at the Defendant, or use them in any way. *See id*. at pg. 85, lines 5-8. Nor did any of them have any physical contact with the Defendant or touch him in any way. *See id*. at pg. 85, lines 9-10, and pg. 86, line 1.

Additionally, the agents stood for the interview because there were no other adequate seats for them to sit on in the room where the interview was being conducted. *See id*. at pg. 86, lines 3-21; Government's Suppression Hearing Exhibits 42-43. The agents stood no closer than 2-3 feet from the Defendant throughout the interview. *See* Suppression Hearing Transcript, Vol. I, pg. 86, lines 3-11. At no point during the interview was the Defendant handcuffed, physically restrained, or threatened. *See id*. at pg. 87, lines 8-14, and pg. 98, lines 8-19. In fact, throughout the interview, the Defendant freely used his hands several times to describe and gesture to things. *See id*. at pg. 98, lines 8-19.

At the beginning of the interview, SA Overhauser displayed his agency-issued credentials to the Defendant and asked him in English if he would be willing to speak to him. *See id*. at pg. 87, lines 15-22. The Defendant indicated in English he would be willing to do so but would prefer to do so with a translator. *See id*. At no point during this initial conversation in English did the Defendant express any concerns about talking to law enforcement nor did he say he did not want to talk to them. *See id*. at pg. 87, lines 23-25, and pg. 88, lines 1-4. The Defendant was informed during his initial conversation with SA Overhauser that he did not have to talk to law enforcement and at no point was told he could not leave; however, SA Overhauser does not specifically recall

telling the Defendant that he could terminate the interview at any time. *See id.* at pg. 96, lines 21-25, pg. 97, lines, 1-4, and pg. 98, lines 20-25. SA Overhauser's initial conversation with the Defendant and the securing of the translator was not recorded. *See id.* at pg. 88, lines 23-25, pg. 89, line 1, pg. 117, lines 18-23, and pg. 118, lines 1-5. Eventually, SA Overhauser was able to secure a translator by phone. *See id.* at pg. 88, lines 5-22. The recording of the interview started once the translator was secured and after the Defendant expressed his consent to proceed with the interview. *See id.* at pg. 89, lines 2-8; Government's Suppression Hearing Exhibit 31.

During the recorded interview, the Defendant spoke English to the agents and understood several of the questions asked in English. *See id.* at pg. 118, lines 9-12, pg. 128, lines 5-11, and pg. 129, lines 7-17; Government's Suppression Hearing Exhibit 31 at 21:10-24:48 minutes. During a specific exchange with the agents in the middle of the inteview, the Defendant answered questions in English and responded to the questions in English and/or Mandarin before the translator could even translate the questions. *See id.* The tone of SA Overhauser and SA Valazquez during the interview was calm and congenial. *See* Government's Suppression Hearing Exhibit 31. At some point, during SA Hubbard's questioning of the Defendant, the tone became more direct, but at no point was the Defendant threatened by any of the agents during the interview or during that exchange. *See* Suppression Hearing Transcript, Vol. I, pg. 120, lines 5-19; Government's Suppression Hearing Exhibit 31 at 21:10-24:48 minutes. Also, at some point during the interview, the Defendant was advised by SA Overhauser that it was a federal crime to lie to a federal agent. *See id.* at pg. 119, lines 3-7; Government's Suppression Hearing Exhibit 31 at 19:15-20:32 minutes. Throughout the interview, the Defendant denied involvement with any crime even after being presented with evidence against him. *See id.* at 118, lines 23-25, and pg. 119, lines 1-2; Government's Suppression Hearing Exhibit 31.

The non-recorded initial conversation lasted approximately 5 minutes, and the recorded interview lasted approximately 46 minutes; thus, the total time of the interview was approximately 51 minutes. *See id.* at pg. 93, lines 8-25, and pg. 94, lines 1-2; Government's Suppression Hearing Exhibit 31. During the recorded interview, SA Overhauser had his phone with the translator on it in one hand and the recording device in the other. *See* Suppression Hearing Transcript, Vol. I, pg. 127, lines 11-21.

According to SA Overhauser, if at any point prior to the interview or during it the Defendant would have said he didn't want to talk to law enforcement or wanted to terminate the interview, the interview would have ended, and he would have been free to leave. *See* Suppression Hearing Transcript, Vol. I, pg. 94, lines 3-19, and pg. 113, lines 11-13. After the interview was over, the Defendant was free to leave. *See id.* at pg. 97, lines 4-25, and pg. 98, lines 1-6.

*Christian Beals' Testimony*

On March 19, 2025, Christian Beals ("Beals") was employed at Superior Fire Alarm and was working in Building B at the Seminole property the morning of the search installing a fire alarm system. *See id.* at pg. 134, lines 1-14, and pg. 141, lines 6-13. Law enforcement had no idea who was in Building B with him when they made contact with Beals. *See id.* at pg. 141, lines 6-13. That morning, he encountered a law enforcement officer wearing tactical gear, a Kevlar vest, and armed with an assault rifle. *See id.* at pg. 134, lines 22-25. Not all the officers he saw that day had a weapon. *See id.* at pg. 135, lines 1-4. During his encounter with law enforcement that morning, an assault rifle was pointed at him. *See id.* at pg. 135, lines 5-19. However, this did not scare him. *See id.* at pg. 144, lines 12-16. Law enforcement did a brief frisk of his person. *See id.* at pg. 136, lines 1-8. He was eventually taken to a location and sat down on railroad ties. *See id.* at pg. 136, lines 9-16. He was there for about 45 minutes. *See id.* at pg. 136, lines 23-25,

and pg. 142, lines 13-23. He didn't feel free to leave but was only temporarily detained. *See id.* at pg. 137, lines 23-25, pg. 138, lines 1-8, pg. 142, lines 13-23, pg. 143, lines 4-25, and pg. 144, lines 1-2. In fact, law enforcement told them that were only being temporarily detained. *See id.* at pg. 138, lines 2-8. After he received his personal items back, he was free to leave. *See id.*

During Beals' encounter with law enforcement that day, they were polite, understanding, courteous, and not intimidating. *See id.* at pg. 135, line 25, pg. 136, lines 1-5, pg. 137, lines 20-22, pg. 141, lines 3-5, and pg. 142, lines 4-7. Furthermore, at no point was he nor the Chinese nationals handcuffed or physically restrained. *See id.* pg. 141, lines 14-17, and pg. 142, lines 8-12.

*Joseph Christian Hull, II's Testimony*

On March 19, 2025, Joseph Christian Hull, II ("Hull") was employed at Superior Fire Alarm and was working in Building B at the Seminole property the morning of the search warrant installing a fire alarm system. *See id.* at pg. 146, lines 22-24, and pg. 147, lines 2-10. That morning, he encountered a law enforcement officer wearing tactical gear with an AR15. *See id.* at pg. 148, lines 9-17. The officer pointed the AR15 at him and patted down his pockets. *See id.* at pg. 148, lines 9-17, and pg. 149, lines 4-9. He was not scared of this encounter and felt like it was just the officer doing his job. *See id.* at pg. 156, lines 1-6. He was eventually taken to a location and sat down on a ledge in front of a garage. *See id.* at pg. 149, lines 10-25, ands pg. 150, line 1. He remembers there were more than 5 law enforcement officers at the ledge when he was there. *See id.* pg. 150, lines 7-13. He was at the ledge for not more than an hour and half but does not have an exact time. *See id.* at pg. 150, lines 14-25. While at the ledge, he was detained and did not feel like he was free to go. *See id.* at pg. 151, lines 22-24, pg. 152, lines 18-25, and pg. 153, lines 1-13. After his time at the ledge, he was allowed to collect his materials from Building

B and leave. *See id*. at pg. 153, lines 9-13. He did not hear law enforcement tell any of the Chinese nationals they were free to leave. *See id*. at pg. 153, lines 20-22.

During Hull's encounter with law enforcement that day, they were polite, courteous, and respectful to him as well as the Chinese nationals. *See id*. at pg. 154, lines 7-10, and pg. 155, lines 5-8. Furthermore, at no point was he handcuffed, physically restrained, or threatened by law enforcement, nor were the Chinese nationals threatened. *See id*. pg. 141, lines 11-19, and pg. 155, lines 9-10. He did see some people handcuffed that day but does not know if these people were the ones caught by law enforcement when they were trying to hide from them. *See id*. at pg. 155, lines 11-21.

*Special Agent Sherita Holden's Testimony*

Special Agent Sherita Holden ("SA Holden") has been employed as a special agent with EPA-CID for five years. *See id*. at pg. 158, lines 12-20. On March 19, 2025, she was one of the officers on scene for the search warrant and interviewed nine Chinese nationals that day, including the co-Defendant Dian Lin Jiang ("Jiang"). *See id*. at pg. 165, lines 2-16, and pg. 172, lines 2-6. Prior to interviewing Jiang, she asked SA Hubbard how he would like her to proceed with the interview. *See id*. at pg. 165, lines 2-16, and pg. 171, lines 19-23. SA Hubbard advised her that out of an abundance of caution to mirandize him. *See id*. at pg. 165, lines 2-16, pg. 168, lines 15-25, pg. 169, lines 1-9, pg. 171, lines 24-25, and pg. 172, line 1. Accordingly, SA Holden mirandized Jiang prior to his statement. *See id*. at pg. 167, lines 21-24. She was not asked to interview the Defendant and had nothing to do with it. *See id*. at pg. 170, line 25, and pg. 171, lines 1-2. SA Holden has no idea what, if anything, SA Hubbard said to SA Overhauser prior to his interview of the Defendant. *See id*. at pg. 171, lines 15-18.

*Special Agent Raquel Valezquez's Testimony*

Special Agent Raquel Valezquez ("SA Valezquez") has been employed as a special agent with OBN for five years. *See id*. at pg. 175, lines 9-13. On March 19, 2025, she was one of the officers on scene for the search warrant and assisted SA Overhauser with the interview of the Defendant that day. *See id*. at pg. 175, lines 14-17. Initially, she was one of the officers who kept an eye on the individuals in front of the property. *See id*. at pg. 177, lines 18-25. There were 3 to 4 armed officers assigned to that duty. *See id*. During the clearing of the building and the execution of the search warrant, if the Defendant needed to use the restroom, he would have been escorted by an officer. *See id*. pg. 179, lines 9-15. During the Defendant's interview, she was secondary support and security. *See id*. at pg. 182, lines 23-25, and pg. 183, lines 1-6.

On the day of the search, SA Valezquez was wearing her BDU, a vest, a duty belt, and a shirt that says "police" on it. *See id*. at pg. 175, lines 18-25, and pg. 176, lines 1 and 15-16. On her duty belt, it held handcuffs, a taser, and two magazines. *See id*. at pg. 176, lines 2-9. She also had a firearm in a leg holster that she never unholstered that day. *See id*. at pg. 176, lines 10-19. Her firearm and handcuffs were visible. *See id*. at pg. 176, lines 20-24.

SA Valezquez did not observe the Defendant speak English. *See id*. at pg. 180, lines 4-6. However, she observed SA Overhauser communicate with the Defendant prior to the use of a translator. *See id*. at pg. 183, lines 19-25, and pg. 184, lines 1-2 and 9-23. She does not recall what was said between the two but remembered that there was enough of a language barrier that a translator was called. *See id*. During the Defendant's interview, SA Overhauser and herself were present. *See id*. at pg. 184, lines 24-25, and pg. 185, lines 1-11. SA Hubbard joined at some point and there were multiple other agents walking throughout the interview room while the interview took place. *See id*. At no point during the interview did anyone threaten the Defendant, pull their

firearm out, or touch the Defendant. *See id*. at pg. 185, lines 12-21. Law enforcement stood for the interview because the other chairs in the room were reclining lawn chairs not conducive to sitting in to conduct an interview. *See id*. at pg. 185, lines 22-25, pg. 186, lines 1-25, and pg. 187, lines 1-13. Ultimately, if the Defendant had asked to leave, terminate the interview, or state he did not want to talk to them at the beginning of the interview, SA Valezquez would have let the case agent make the decision on how to proceed. *See id*. at pg. 187, lines 14-25, and pg. 188, lines 1-17. At the conclusion of the interview, the Defendant went back to the garage. *See id*. at pg. 188, lines 5-7.

*Defendant Jin Zhao Chi's Testimony*

The Defendant was born in Fujian, China. *See* Suppression Hearing Transcript, Vol. II, pg. 203, lines 21-22. His native language is Fuzhou, but he also understands Mandarin. *See id*. at pg. 204, lines 11-18. His highest grade of education was 6th grade. *See id*. at pg. 204, lines 19-25. The Defendant moved to the United States when he was 23 years old. *See id*. at pg. 205, lines 8-11. The Defendant has had hearing difficulties since he was 40 years old. *See id*. at pg. 205, lines, 1-7. While in the United States, he has learned a little bit of English, such as simple words and restaurant related words due to his time working in a restaurant. *See id*. at pg. 205, lines 12-17, pg. 206, lines 3-7, and pg. 217, lines 22-24. Prior to March 19, 2025, the Defendant had never been arrested or had any real contact with law enforcement in the United States. *See id*. at pg. 208, lines 18-23.

On March 19, 2025, the Defendant lived in the residence at the Seminole property where the search took place. *See id*. at pg. 206, lines 8-25. Upon arrival at the property, law enforcement communicated with him through gestures. *See id*. at pg. 207, lines 4-9 and 21-22. The officers were wearing bulletproof vests and had weapons, including a very long one and pistols. *See id*. at

pg. 207, lines 10-15. Once inside the residence, the officers pointed their weapons at him and he was scared. *See id.* at pg. 207, lines 16-24, and pg. 221, lines 1-8. This pointing of the gun was only for a matter of seconds. See id. at pg. 221, lines 9-11. While in the residence, he saw 7 to 8 officers. *See id.* at pg. 207, line 25, and pg. 208, line 1.

Once outside the residence, he saw 7 to 8 vehicles and felt like the property was surrounded. *See id.* at pg. 208, lines 2-11. It was cold outside and he was not allowed to get his coat before going outside. *See id.* at pg. 208, lines 24-25, and pg. 209, lines 1-3. Once at the area he was told to go to outside, he was searched by law enforcement, and they took his cell phone and driver's license. *See id.* at pg. 209, lines 4-10. Also, there were two officers at the location with him, he was never left alone, he was told to sit down, and he did not feel like he was free to leave. *See id.* at pg. 209, lines 4-10, pg. 210, lines 3-15, and pg. 211, lines 18-23. During his time outside, he did not speak English to any law enforcement officers, and it was never explained to him what he was doing outside. *See id.* at 210, lines 17-23. He was outside for approximately one hour. *See id.* at 210, lines 24-25, and pg. 211, line 1.

After being outside, the Defendant was led inside to the residence's garage. *See id.* at pg. 211, lines 24-25, and pg. 212, lines 1-3. The Defendant did not try to leave the garage because there were officers at the garage door with weapons and handcuffs. *See id.* at pg. 212, lines 16-22. However, he did ask to go to the restroom and was escorted to it by an officer with a weapon. *See id.* at pg. 212, lines 23-25, and pg. 213, lines 1-9. After which, he was taken back to the garage. *See id.* at pg. 213, lines 10-11. Eventually, he was taken to the office where the interview occurred, which was a common area in the residence. *See id.* at pg. 213, lines 12-17, pg. 226, lines 23-25, and pg. 227, lines 1-15.

Once in the office, an officer gestured for the Defendant to sit in a chair. *See id*. at pg. 213, lines 18-23. There were four officers in the room during the interview, but the interview began with just two officers, and at some point, a third officer joined in the interview while others walked in and out of the room throughout the interview. *See id*. at pg. 214, lines 8-14, pg. 227, lines 23-25, pg. 228, lines 1-9. If a fourth officer was in the interview room, he was nowhere near the Defendant during the interview. *See id*. at pg. 228, lines 7-9. While seated in the chair, the Defendant was frightened and felt suppressed with four officers standing behind him. *See id*. at pg. 214, lines 15-21. Also, while in the chair, he did not speak with anyone face to face in Mandarin. *See id*. at pg. 214, lines 23-24. Although the officers spoke to him in English, he could not understand them, nor could he understand any other officer speaking to him in English that day. *See id*. at pg. 215, lines 1-5, pg. 218, lines 1-25, pg. 219, lines 1-25, and pg. 220, line 1. Nevertheless, the Defendant did agree to talk to law enforcement that day with an interpreter. *See id*. pg. 220, lines 2-14. Specifically, the Defendant stated that at no point did he speak English to the officers during the interview. *See id*. at pg. 220, lines 15-25.

Once the interpreter was on the phone, he could understand her some, but there were some things he could not understand because it was noisy. *See id*. at pg. 215, lines 6-12. During the interview, he was not told through the interpreter that he was the subject of a search warrant, he was free to leave the office, or that he was not under arrest. *See id*. at pg. 215, lines 17-25, and pg. 216, lines 1-4. During the interview, he answered all the questions asked by law enforcement because he was scared, and with so many officers there, he thought if he refused to answer the questions, the officers would take him. *See id*. at pg. 216, lines 5-10. Also, during the interview, he was directed by law enforcement to give the password to his phone to them and did not feel like he could refuse them. *See id*. at pg. 216, lines 11-21.

From the moment the Defendant saw law enforcement arrive at the property, he felt like he could not refuse their instructions because he was scared. *See id*. at pg. 209, lines 11-25, and pg. 2010, line 1. However, at no point did law enforcement touch the Defendant, other than a brief pat down, handcuff him, physically restrain him, threaten him, yell and scream at him, or point a firearm at him. *See id*. at pg. 221, lines 12-25, pg. 222, lines 1-20, pg. 226, lines 3-13, pg. 227, lines 21-22, pg. 228, lines 24-25, and pg. 229, lines 1-25. Also, they were polite and courteous to him throughout the entire encounter that day. *See id*. at pg. 221, lines 17-18, pg. 222, lines 21-25, pg. 223, lines 1-4, pg. 224, lines 20-25, pg. 225, lines 1-7 and 22-25, pg. 226, lines 1-2, and pg. 228, lines 10-21. Law enforcement even went into the residence to get coats for those individuals outside who were cold. *See id*. at pg. 223, lines 5-25, and pg. 224, lines 1-8. Furthermore, at no point was he ever told by law enforcement that he had to talk to them or that he could not leave. *See id*. at pg. 230, lines 10-20. Ultimately, he went back to the garage after the interview, he was not arrested that day, and he was allowed to go about his business at the conclusion of the search. *See id*. at pg. 230, lines 24-25, and pg. 231, lines 1-3.

## III. ARGUMENT AND AUTHORITIES

"It is well-established that law enforcement need not administer *Miranda* warnings every time a suspect is questioned." *United States v. Nahkai*, 139 F.4th 859, 866 (10th Cir. 2025) (citing *United States v. Rogers*, 391 F.3d 1165, 1169 (10th Cir. 2004)) (emphasis added). "Rather, *Miranda's* protections 'only apply when an individual is subject to "custodial interrogation."'" *Id*. (quoting *Miranda v. Arizona*, 384 U.S. 436, 439 (1966)) (emphasis added). "A suspect is deemed to be in custody when their 'freedom of action is curtailed to a degree associated with formal arrest.'" *Nahkai*, 139 F.4th at 866 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quotations omitted)). "The custody inquiry is objective and asks 'whether "a reasonable person

in the suspect's position would have understood the situation ... as the functional equivalent of [a] formal arrest.""" *Nahkai*, 139 F.4th at 866 (quoting *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008); *Berkemer*, 468 U.S. at 442).

"Under Tenth Circuit precedent, 'several non-exhaustive factors' are helpful in assessing whether an interrogation is custodial." *Nahkai*, 139 F.4th at 866 (citing *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008). "These include: (1) whether officers advise the suspect that he or she is not required to answer questions and/or that he or she may terminate the interview, (2) the nature of the questioning, and (3) whether police dominated the atmosphere of the encounter." *Id.* "Still, we must not lose the forest for the trees but 'look to the totality of the circumstances and consider the police-citizen encounter as a whole[.]'" *Id.*

For example, in *United States v. Nahkai*, law enforcement "never advised [the defendant] that he could refuse to speak with them." 139 F.4th at 866. However, the Tenth Circuit found that even though there was a lack of police advisement, "[the court has] been clear that the police advisement factor is not dispositive. It is 'only one factor to consider.'" *Nahkai*, 139 F.4th at 866 (quoting *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021)). "If this factor were dispositive in every case, it would displace other factors which we have consistently deemed relevant to the custody analysis." *Nahkai*, 139 F.4th at 866. "Thus, although the lack of police advisement [in *Nahkai*] favors a finding of custody, [the court's] focus remains on the totality of the circumstances because [it] cannot 'pick[ ] some facts and ignor[e] others.'" *Nahkai*, 139 F.4th at 866 (quoting *Jones*, 523 F.3d at 1240).

Next, in *Nahkai*, the Tenth Circuit examined the nature of the questioning. The court reasoned that "'prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave.'" *Nahkai*, 139 F.4th at 866 (quoting *United States*

*v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)). "In assessing this factor, [the court] consider[s] facts like the length of the questioning, the substance of the questions and whether they were accusatory, and whether the tone was threatening." *Nahkai*, 139 F.4th at 866 (citing *Guillen*, 995 F.3d at 1110). "These considerations inform whether the questioning rose 'to the level of coercion.'" *Id.* In *Nahkai*, the Tenth Circuit found that the defendant's questioning for 41 minutes was "not so long as to render it coercive." *Nahkai*, 139 F.4th at 866-67; *see also Jones*, 523 F.3d at 1238, 1241 (finding no custody where interrogation lasted for 45 minutes to an hour).

Furthermore, as to the substance of the questions, although law enforcement focused their questioning only on the defendant's behavior, the court concluded that "the questioning was typical in terms of what one would expect during police questioning and was not so coercive as to make a reasonable person understand that they were effectively under arrest." *Nahkai*, 139 F.4th at 867. The court reasoned that "'[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" *Nahkai*, 139 F.4th at 867 (quoting *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (quotations omitted)). In *Nahkai*, the officer's insistence that [the defendant] was not telling the truth, and his statement that he knew there was more to the story than [the defendant] was letting on do not render his tactics coercive." *Nahkai*, 139 F.4th at 867. "In this regard, '[t]here is no indication that [the officer's] questioning was any more coercive than what would be expected in any questioning by a police officer of an individual suspected of a crime.'" *Nahkai*, 139 F.4th at 867 (quoting *United States v. Simmonds*, 641 F. App'x 99, 103 (2d Cir. 2016) (noting that the form of questioning did not "necessarily support a conclusion that the interrogation was custodial" where the defendant was accused of lying, confronted with incriminating evidence, and advised that it was in his best

interest to be honest)). "When confronted with alleged wrongdoing, regardless of innocence, most suspects are likely to disagree and that alone does not render further questioning coercive." *Nahkai*, 139 F.4th at 867. "Although [the officer] testified that the conversation became confrontational, it never became 'unusually confrontational.'" *Nahkai*, 139 F.4th at 867 (quoting *United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008)). Therefore, "[t]he extent to which the conversation may have become confrontational was not enough to have caused a reasonable person to understand the situation as the '"functional equivalent of formal arrest."'" *Nahkai*, 139 F.4th at 867 (quoting *Chee*, 514 F.3d at 1112; *Berkemer*, 468 U.S. at 442).

Additionally, in *Nahkai*, the court found that the defendant "was never confronted with 'mounting' physical evidence that 'pointed to him[,]'" *Nahkai*, 139 F.4th at 868 (quoting *Guillen*, 995 F.3d at 1102), and the officer's "questioning 'even when directed at soliciting a confession ... remained calm and conversational.'" *Nahkai*, 139 F.4th at 868 (quoting *United States v. Wagner*, 951 F.3d 1232, 1251(10th Cir. 2020)). At no point, did law enforcement raise their voice, threaten the defendant, or unduly pressure him into answering the officer's questions. *See Nahkai*, 139 F.4th at 868. "Thus, [the court did] not believe that the nature of the questioning rose to the level of coercion that would make a reasonable person in [the defendant's] position understand the situation to be the "'functional equivalent of formal arrest."'" *Nahkai*, 139 F.4th at 868 (quoting *Chee*, 514 F.3d at 1112; *Berkemer*, 468 U.S. at 442).

Lastly, in *Nahkai*, the Tenth Circuit examined the police-dominated atmosphere factor. The court stated that "[s]everal factors bear on whether police dominated the encounter, including: separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a

manner implying that compliance with the request might be compelled." *Nahkai*, 139 F.4th at 868 (citing *Griffin*, 7 F.3d at 1519). However, the court also stated that "although the[se] factors are helpful, the ultimate inquiry is one of the totality of the circumstances." *Nahkai*, 139 F.4th at 868 (citing *Jones*, 523 F.3d at 1240).

In *Nahkai*, the court found that at no point did law enforcement touch the defendant; the defendant retained freedom of movement throughout his encounter and interview with law enforcement; the defendant was never searched, handcuffed, or physically restrained; the doors to his vehicle remained unlocked and he entered and exited his vehicle on his own; the defendant voluntarily accompanied law enforcement; the defendant sat in the front seat of the truck and not in the backseat behind barriers; the tone of the interview remained calm and non-threatening; two officers were present in mostly plain clothing; an officer's firearm was visible, but was holstered and it was not displayed or brandished in a threatening or coercive manner; and although the defendant was separated from his wife during the interview, he never asked for her to be present and law enforcement did not deny her ability to be present for it. *See Nahkai*, 139 F.4th at 868-69. Furthermore, the defendant was not questioned in a police station. *See Nahkai*, 139 F.4th at 869. He was questioned on his own property. *Id.* "The Tenth Circuit has explained that being questioned in one's home makes it less likely that a custodial interrogation occurred." *United States v. Dayton*, 622 F.Supp.2d 1109, 1112 (N.D. Okla. June 25, 2008) (citing *United States v. Rogers*, 391 F.3d 1165, 1170 (10th Cir. 2004)). Ultimately, in *Nahkai*, the Tenth Circuit held that the questioning of the defendant was not in a police-dominated atmosphere and "did not amount to a custodial interrogation." 139 F.4th at 866-69.

Defendants' motions to suppress were denied similarly in *United States v. Haymond*, 2010 WL 11508830, *1 (N.D. Okla. January 15, 2010); *United States v. Dayton*, 622 F.Supp.2d 1109,

1111 (N.D. Okla. June 25, 2008); *United States v. Vallejos*, 2025 WL 1950187, *1 (10th Cir. 2025); *United States v. Wagner*, 951 F.3d 1232 (10th Cir. 2020); *United States v. Kuhn*, 809 F.Supp.3d 326 (E.D.N.C. November 17, 2025); and *United States v. Brannon*, 2014 WL 12789706, *1 (D.N.M. July 22, 2014).

Here, the Defendant's motion to suppress should be denied for the same reasons as highlighted in the above-referenced cases. The Defendant was not in custody during his interview and *Miranda* was not required. First, at the beginning of the Defendant's conversation with SA Overhauser, SA Overhauser informed the Defendant that he did not have to speak with law enforcement. Despite this admonishment, the Defendant voluntarily agreed to speak with law enforcement as long as there was a translator. Although it is unclear if SA Overhauser also informed the Defendant that he could terminate the interview at any time, that fact he was advised he did not have to speak to them and agreed to do so willingly causes this factor to weigh in favor of the United States.

Furthermore, if the Defendant wants to claim he could not understand what SA Overhauser was telling him in English prior to the translator participating in the interview, including SA Overhauser's admonishment that he did not have to speak to law enforcement, the Defendant's credibility is in question. Also, he has a vested interest in not being forthcoming with the Court by making it think he cannot speak or understand English. Not only did the Defendant have several conversations with SA Bahney in English outside the residence, including one where he explained in detail how she could locate the coats in the residence, he also engaged in English with SA Overhauser prior to the interview as well as the agents during a portion of the recorded interview and answered several questions in English and/or Mandarin before the translator could even translate the questions. Thus, the Defendant's credibility should be in doubt.

Second, the overall nature of the questioning was not aggressive, threatening, or coercive, nor was it overly lengthy. Throughout the entire interview, EPA-CID SA Overhauser and OBN SA Valezquez were calm, collected, cordial, and amicable with the Defendant. At no point did they threaten or intimidate the Defendant. Although EPA-CID SA Hubbard did interject himself and question the Defendant for a few minutes during the middle of the interview in a tone that was more direct, it was not threatening in any way, did not negatively influence or impact the interview, and at no point did the Defendant ask for the interview to be terminated nor did he express to the agents that he no longer wanted to talk to them because of this interjection. In fact, the Defendant stuck up for himself during that portion of the questioning and stuck to his story. Furthermore, the interview was not overly lengthy and lasted approximately 51 minutes (non-recorded conversation and recorded interview together). Thus, this factor weighs in favor of the United States.

Third, the facts show the Defendant was not questioned in a police-dominated atmosphere. There is no question there was a large police presence at the property that day when the law enforcement cleared it and executed the search warrant. However, after the initial show of force, the climate of the environment completely changed. Not only were the individuals outside, including the Defendant, taken care of by being given coats to keep warm, but they were also brought inside the garage once the premises were deemed safe and secure. Furthermore, at no point during the Defendant's encounter with law enforcement that day as well as throughout his interview was the Defendant handcuffed, physically restrained, threatened, yelled or screamed at by law enforcement. Other than a brief pat down for officer's safety, law enforcement never laid a hand on him. Also, other than arguably a few seconds at the very beginning of law enforcement's arrival on the property when they were clearing the buildings on the premises, no one pointed a firearm at the Defendant. Additionally, the Defendant's interview was conducted in a common

area room in a residence the defendant lived in and was familiar with by two to three agents who did not have firearms or handcuffs in their hands. Their firearms were either holstered at their side or on their leg. In fact, EPA-CID SA Overhauser had to use one hand to hold his phone during the interview and use his other hand to hold the recorder. Lastly, although the agents stood during the interview because the immediate seating situation in the room was not conducive for them to sit, they were 2-3 feet from the Defendant and did not intimidate him in any way. Thus, this factor weighs in favor of the United States.

Therefore, after considering the totality of the circumstances and weighing each of the factors in this case, the court should deny the Defendant's motion because he was not in custody when he was questioned, thus *Miranda* was not required.

However, if the Court decides the Defendant was in custody during his interview and *Miranda* was required, the Defendant's statement should be allowed for impeachment purposes if the Defendant testifies at trial and gives conflicting testimony to his statements on March 19, 2025. *See Harris v. New York*, 401 U.S. 222 (1971).

## IV. CONCLUSION

Wherefore, based on the foregoing as well as the United States' initial response to the Defendant's Motion (Doc. 44), the United States respectfully requests the Court deny the Defendant's Motion.

Respectfully submitted,

CHRISTOPHER J. WILSON
United States Attorney

s/ *T. Cameron McEwen*
T. CAMERON MCEWEN
AL BAR # 7161-R67M
Assistant United States Attorney
520 South Denison
Muskogee, OK 74401
Telephone: (918) 684-5100
Fax: (918) 684-5150
Cameron.McEwen@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2026, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

Marna Franklin, Attorney for Jin Zhao Chi
Craig M. Hoehns, Attorney for Dian Lin Jiang

s/ *T. Cameron McEwen*
T. CAMERON MCEWEN
Assistant United States Attorney