**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 26-CR-66-RAW |
| JIN ZHAO CHI, | ) | |
| Defendant. | ) | |

**SUPPLEMENTAL BRIEFING RE: MOTION TO SUPPRESS STATEMENTS (Doc. 39)**

**COMES NOW,** Jin Zhao Chi, by and through his CJA attorney of record, Marna Franklin, hereby offering the following in support of his Motion to Suppress (Doc. 39).

**SUMMARY OF TESTIMONY AND EVIDENCE**

On September 3, 2026, the Court heard testimony from two government witnesses, Special Agent in Charge Kim Bahney and Special Agent Christopher Overhauser, both with the Environment Protection Agency Criminal Investigation Division (EPA-CID). The government also admitted 43 exhibits. The defense called four witness, lay witnesses Christian Beals and Joseph Hull, as well as Shertia Holden with the EPA-CID and Rachel Valezquez with the Oklahoma Bureau of Narcotics. Thirteen exhibits were admitted by the defense (Exhibits 1-4 and 6-14). On September 18, 2026, the defense called Mr. Chi and then rested.

1. **Special Agent in Charge Kim Bahney**

SA Bahney testified that she has been an agent for eighteen (18) years, and she testified regarding her law enforcement training and experience, including having involvement with over 200 search warrant executions. (Trans., Vol. I, page 12, lines 12-25). She specifically was part of a team with EPA and other law enforcement agencies that conducted a search warrant at a location in Seminole, Oklahoma back on March 19, 2025. (Trans., Vol. I, page 14, lines 16-22) Because of the larger effort and size of the property, she would say there were between twenty and thirty law enforcement officers involved to conduct the search warrant. (Trans., Vol. I, page 16, lines 6-10) They all were armed with firearms. (Id., lines 11-15) After describing certain admitted exhibits as they related to each other, Bahney was asked why there were so many officers that were part of the search warrant, and her response was partly for the search, and "*also for the safety. If you think about entering a building and the way that we need to do our clearing for buildings, that requires a large amount of law enforcement officers to ensure that we can systematically clear buildings, gather anyone who would be on the property and deem the site secure and safe.*" (Trans., Vol. I, page 23, lines 17-22) In describing the process of the search warrant execution, she testified that they all would approach the scene ultimately from an entryway, but "*had some individuals around the property in case we had individuals who were running.*" (Trans., Vol. I, page 24, lines 2-4) She testified they enter[ed] with weapons ready.

Meaning, not aimed up, but either holstered or in their hand low and pointed down to be able to clear the rooms. (Id., lines 6-9) The purpose of having weapons "ready" is due to "*perceived unknown threats inside; one does not know what they are going to be walking into. In this case, it was a large scene with multiple workers associated with a marijuana grow, and so ultimately for officer safety, they would ensure that they were ready if they needed to respond to a threat*." (Trans., Vol. I, page 25, lines 19-24) Her responsibility that particular day was as a supervisor on site and she was not leading the search warrant. (Trans., Vol. I, page 26, lines 15-19) The assigned case agent that day was Joseph Hubbard, an EPA special agent. (Trans., Vol. I, page 27, lines 18-21) In referencing government's Exhibit 4, Bahney indicated that she was standing in that area as witnesses came out of the building. (Trans., Vol. I, page 28, lines 13-18) She testified that as law enforcement cleared individuals out of the building, they would send them to "this area here where the barricade wall is set up." (Trans., Vol. I, page 29, lines 16-18) She testified none of the individuals were handcuffed, but some were "*escorted out, some were sent out and pointed in the direction*." (Id., lines 19-25) She then identified 11 to 13 individuals from government's Exhibits 5-17 that were escorted or asked to sit out on the barricade. (Trans., Vol. I, page 30, lines 19-25) Each of the individuals were depicted holding in most of the photos, a sheet. (Trans., Vol. I, page 31, lines 22-25). Exhibit 5 specifically depicts Mr. Chi. (Trans., Vol. I, page 32, lines 3-5) According to Bahney, the sheet of paper has their

name and is used as a form of identification for the individuals who were on site that day. (Id., lines 21-23) She did not know who filled it out that day, but it was a form used by the Oklahoma Bureau of Narcotics. (Trans., Vol. I, page 33, lines 1-2) She stated the purpose of the form was for identification, and there had been situations where people had not been forthcoming with their identities, so the picture with the identifiers puts together who they are claiming to be on that day. (Id., lines 11-16) The government then published Exhibit 32, a video depicting law enforcement officer in tactical gear entering a house. (Trans., Vol. I, page 34, lines 15-22) Bahney then further describes what she observed from exhibit 32: that there were individuals coming out, one in the background, and the agent "*maybe had his hand on his shoulder guiding him to the location where we were gathering witnesses*." (Trans., Vol. I, page 36, lines 21-25) She testified that the individual in the blue sweatshirt that walked out of the house through the breezeway was Mr. Chi, unescorted, at **11:09 a.m.**. (Trans., Vol. I, page 37, lines 9-21) Once Mr. Chi walked to the berm and gots there, there was "*a basic law enforcement pat down for weapons, and again for purposes of safety*." (Trans., Vol. I, page 39, lines 3-7) When asked if that was typical action, Bahney indicated that it would depend on the circumstances and on the individuals. In this instance, she believed Mr. Chi was identified as one or perhaps one of the main people on site, maybe one of the "*more main people of concern*." (Id., lines 14-17) Bahney testified that she saw "*they gestured for him to move in that direction.*

*He walks past the breezeway. He turns around and he looks at this agent right here in the front, Joe Hubbard, the main case agent, and it seems like maybe he has a word with Joe and Joe holds up his finger and kind of gestures for him to continue down onto the berm.*" (Trans., Vol. I, pages 40-41, lines 23-3) In reviewing Exhibit 32, Bahney indicated that Chi was not escorted out, but directed out. (Id., page 41, lines 22-24) Bahney testified that she said "*a few words to them*." (Trans., Vol. I, page 43, lines 10-11). Bahney then noted that it was "*very cold that day*" and that one individual, Mr. Chi, asked for coats because he was cold, and they wanted to go inside the house to get the coats. (Id., lines 12-20) According to Bahney, Mr. Chi asked in English. (Id., lines 21-22) They were advised that no, they couldn't allow them inside, but asked if they were okay with her going inside to a certain area to get coats. According to Bahney, Mr. Chi said yes, and she asked them where she could go inside to get coats. She did not testify that Mr. Chi answered her in English, but testified, "*I basically walked in a side door to the residence in the breezeway and located five or six coats from a closet and brought them out to the individuals*." (Trans., Vol. I, page 44, lines 3-6) This "entire" conversation was in English. (Id., lines 10-11) Baheny's "*best guess*" is that the individuals remained there at the berm for "*at least 45 minutes*." (Id., lines 12-15) Two individuals that were presumed to be on site who were in hiding took quite a bit of time to locate. (Id., lines 16-19) According to Baheny, because it was cold, they asked if they could go inside the garage area, and so at some point

"*we moved them into that garage area*." (Id., lines 22-24) Bahney then identified photos of the individuals after they entered the garage area, excluding the two Caucasian individuals. (Trans., Vol. I, page 45, lines 16-22) In Exhibits 19-30, they further have their names and dates of birth in the pictures. (Trans., Vol I., page 46, lines 23-25) Mr. Chi is specifically identified in Exhibit 19. (Trans., Vol. I, page 47, lines 6-8) Bahney further testified that there were two individuals who had been in hiding that day that were cuffed inside the garage and escorted out that day by HSI. (Trans., Vol. I, page 48, lines 11-15) She testified that approximately 10 individuals were interviewed by law enforcement that day. (Trans., Vol. I, page 49, lines 19-21) One individual was mirandized. (Trans., Vol. I, page 50, lines 3-5)

During cross examination it was established that Agent Bahney office base is in Dallas, Texas. (Trans., Vol. I, page 51, lines 13-14) She is familiar with Agent Joe Hubbard and testified that he is experienced as an agent, being with the agency for approximately 2 ½ years. (Trans., Vol. I, pages 51-52, lines 23-7) She was familiar that he was the affiant for the search warrant. (Trans., Vol. I, page 52, lines 11-13) Prior to the warrant execution, she was familiar with the investigation and evidence that the CID had prior to arrival, and agreed that Mr. Chi was included in the affidavit for the search warrant, and again noted he was "*one of the main people*." (Trans., Vol. I, page 53, lines 1-8) She further acknowledged that Mr. Chi was a "*main subject of the investigation*." (Trans., Vol. I, page 53, lines 11-12) She did not draft a

report pursuant to her role in this investigation. (Trans., Vol. I, page 54, lines 6-8) There was a written operations plan for the warrant execution, and the briefing occurred at an OBN office. (Id., lines 13-17) She could not say with certainty exactly who was at the briefing, but in general everybody that was going to be involved in the warrant was there. (Trans., Vol. I, page 55, lines 9-11) The purpose of the briefing is to make sure everyone was on the same page. (Id., lines 22-24) She was unaware of any of the 20 to 30 law enforcement officers utilizing body worn video cameras on that day, including any local PD. (Trans., Vol. I, pages 55-56, lines 25-19) She testified that she was not aware of drones being used that day. (Trans., Vol. I, page 57, line 4) Everyone had identifiers on identifying them as law enforcement that day, and some did have multiple weapons, primary the long gun rifle carriers. (Id., lines 11-15) They all carry Glock handguns, and have handcuffs. (Id., lines 18-24) On that particular day, because they were serving a search warrant, she had her cuffs on, because "*I know I might need them that day. So as an agent, you know, I am preparing myself*." (Trans., Vol. I, page 58, lines 2-6) There was no arrest warrant for anybody that day, and [with the two individuals that were running] it was clear that if you did run, you would be tracked down and brought in, for "*safety*." (Id., lines 10-15) Being outside, she did not see inside the house when officers entered, and could not testify whether or not a gun was pointed inside the house. (Id., lines 16-21). While seated on the berm, Bahney acknowledged that there was nobody

out there that spoke Mr. Chi's language. (Id., lines 24-25)

Despite her presence in the area, Bahney did not know if Mr. Chi was asked permission for his picture to be taken as depicted in Exhibit 5. (Trans., Vol. I, page 59, lines 23-25) When asked if Exhibit 5 looked like a mugshot, Bahney stated that to her, it looked like an identifying photo "*because I knew that was the purpose of them taking the photo*." (Trans., Vol. I, page 60, lines 4-13) Referencing Exhibit 19, Bahney again testified that it "*looks like a photo identifier or a photo taken for identification purposes*." (Id., lines 17-18) While outside during the 45 plus minutes, law enforcement "*asked for phones, that people needed to basically empty out (sic) and put their phones down on the ground. There were certain phones that we had the authority to examine. The individuals then picked up their phones and took back their phone if they were not the phones of interest*." (Trans., Vol. I, page 61, lines 19-25) Mr. Chi's phone was one of the phones that was confiscated. (Trans., Vol. I, page 62, lines 7-9) Bahney agreed that it would be customary for "us" to take identifications. (Trans., Vol. I, page 63, lines 10-11) She did not know how many officers were physically present when taking the individuals to the garage. (Trans., Vol. I, page 64, lines 9-11) She agreed the garage was unheated, with one door, and no chairs inside to sit on. (Id., lines 14-20). She testified that the agent in charge would determine if a *Miranda* warning was to be read to a subject. (Trans., Vol. I, page 66, line 10-12)

2. **Special Agent Christopher Overhauser**

The government's second witness was Christopher Overhauser. Overhauser testified that he is employed with the EPA's special investigation division and has been for 24 years. (Trans., Vol. I, page 73, lines 11—15). He provided his training and experience in the field of law enforcement. Regarding the March 19, 2025, search in Seminole, Overhauser acknowledged that he was present, and assisted as a "rifle carrier" to make entry into the property, and after the initial entry and the facility had been secured, he was tasked with conducting an interview, and then later tasked with searching the premises. (Trans., Vol. I, page 76, lines 5-10) Upon entry of the premises, he was holding the rifle, carrying his agency issued handgun, and was wearing a ballistic vest. (Trans., Vol. I, page 77, lines 3-10) Prior to conducting the interview, he stored his rifle but was not aware if he took off his body armor. (Id. lines 18-25) The one interview he conducted was of Mr. Chi, and it took place inside the doorway in a small room depicted in government's Exhibit 32. (Trans., Vol. I, page 78, lines 21-25) His recollection was that the doorway from the room to the kitchen was open, and the doorway to the breezeway was closed. (Trans., Vol. I, page 81, lines 17-18) Mr. Chi was seated in the white folding chair as depicted in Exhibit 42 during the interview. (Id., lines 13-17) He was present, as well as Agent Velazquez with the Oklahoma Bureau of Narcotics. Neither of them spoke any Mandarin or Chinese. (Id., lines 18-1) Special Agent Joseph

Hubbard also with the EPA CID was involved in the interview momentarily, and there was a translator on the telephone. (Trans., Vol. I, page 83, lines 3-5). According to Overhauser, he recalled that approximately 20 minutes into the interview Hubbard approached and began to ask some questions and "*make some assertions*" during the interview. (Id. lines 8-11) Hubbard did not direct him on how to conduct the interview, and he was not instructed by Hubbard or anyone that he needed to read *Miranda* rights to Mr. Chi. (Id., lines 14-20) He acknowledged that his jacket would not have covered his gun holstered on his side, and Agent Valezquez was wearing a BDU style uniform and also had a firearm in a holster on her hip. (Trans., Vol. I, page 84, lines 1-15) When Hubbard came in, he had on an agency-issued shirt and also had a firearm. (Trans., Vol. I, pages 84-85, lines 23-4) During the interview, Overhauser estimated he was two to three feet away from Mr. Chi, with Agent Valezquez to his right and Agent Hubbard, standing behind him or Valezquez. (Trans., Vol. I, page 86, lines 7-11) They all stood during the interview because "*we did not have anywhere to sit.*" (Id., lines 12-20) At one point during the interview another agent asked Mr. Chi about giving his password for his phone. (Trans., Vol. I, page 87, lines 2-4) According to Overhauser, Mr. Chi was not handcuffed, physically restrained, or threatened during the interview. (Id., lines 8-14) Overhauser "*approached*" Mr. Chi and displayed his credentials, and asked if he would be willing to participate in an interview. Mr. Chi "indicated" that it would be better if there

was an interpreter or translator involved. (Id., 16-19) This initial contact with Mr. Chi was in English. (Id., lines 20-22) Overhauser then engaged a translator from a tollfree number and asked for someone that spoke Chinese, and he was connected with a translator. (Trans., Vol. I, page 88, lines 14-22) Overhauser did not start recording his contact with Mr. Chi until after establishing the translation service. (Trans., Vol. I, page 89, lines 4-5) Overhauser did not read Mr. Chi his *Miranda* rights, the reason given was because he was conducting an "*investigative interview*" and "*not arresting*" the Defendant. (Id., lines 9-13) The recording of the interview (Government's Exhibit 31) is approximately 46 minutes in length, and the with the preliminary questioning, a total of 51 minutes. (Trans., Vol. I, page 93, lines 10-25) According to Overhauser, Mr. Chi was specifically told that he did not have to talk to them, but ***was not*** told that he could terminate the interview at any time. (Trans., Vol. I, pages 96-97, lines 23-3) After the interview was concluded, Mr. Chi was "*allowed*" to leave the area where they had conducted the interview. (Trans., Vol. I, page 97, lines 10-11) Upon the Court's clarification, Overhauser then corrected his testimony that when he said he (Overhauser) had no further questions, he "*disengaged with Mr. Chi and at that point he was free to move as he saw fit*." (Trans., Vol. I, pages 97-98, lines 25-2) Other individuals that were employees were seated in the garage area. (Trans., Vol. I, page 99, lines 6-7). Overhauser did not see any individuals, including Mr. Chi, walking around without law enforcement.

(Id., lines 8-11)

On cross examination, it was established that prior to the warrant execution, Overhauser had read portions of the search warrant and had seen Mr. Chi's name within the affidavit of the warrant. (Trans., Vol. I, page 100, lines 6-13) Overhauser did not know who he came into contact upon entry of the property, and did not know who had first encountered Mr. Chi. (Trans., Vol. I, page 101, lines 14-20) Overhauser acknowledged there being a table depicted in Exhibit 38, and chairs in Exhibit 40, and despite those items in the residence, they were not utilized so that they could be at eyelevel with Mr. Chi. (Trans., Vol. I, pages 100-101, lines 21-9) Overhauser acknowledged that all CID officers have the same general training for interviews. (Trans., Vol. I, page 101, lines 21-23) Overhauser, like any law enforcement officer, possessed a gun, badge, and handcuffs. (Trans., Vol. I, page 102, lines 2-4) His ballistic vest is a tool to deal with threats, and he continued to wear his sidearm during the interview. (Id., lines 9-17) Overhauser "*did not recall*" if he had access to a written *Miranda* waiver form that day. (Id., lines 18-20) He was then shown defendant's Exhibit 1, and he recognized it as a specific EPA advice of rights form. (Trans., Vol. I, page 103, lines 2-3) He did not recognize Exhibit 2, a foreign language bate-stamped rights form with "U.S. v. Chi, Jinzhao et.al" in the bottom left corner. (Id., lines 12-14) Overhauser agreed that the property that was the subject of the warrant was some miles from town, approximately

over 20 acres, and was in an isolated area. (Id., lines 15-20) He knew that the package that was the center of the warrant was addressed to Mr. Chi, and he knew Mr. Chi's phone number was listed on the package to be delivered. (Trans., Vol. I, pages 103-104, lines 21-3) He understood that the warrant allowed for the seizure of Mr. Chi's phone and that Mr. Chi was the target of the investigation. (Trans., Vol. I, page 104, lines 4-9) Before arriving to execute the warrant, Overhauser knew that Mr. Chi had no criminal history with no prior arrests by American law enforcement. (Id., lines 13-19) He was not aware of any instance that Mr. Chi would have had his *Miranda* warning read to him prior to his interview (Trans., Vol. I, page 105, lines 1-4) Overhauser agreed that the warrant was ***not*** a "no-knock" warrant. (Id. lines 13-14) Prior to the warrant execution, there was a debriefing held in a church led by Hubbard where he (Overhauser) was given his tasks, responsibilities and duties. (Id., lines 15-24) That meeting occurred before the search warrant, and Overhauser testified that he heard everything that Hubbard said. (Trans., Vol. I, page 106, lines 11-16) He was well aware prior to going onto the property that he was likely to encounter Chinese Nationals. (Id., lines 17-20) He learned that a drone was utilized by a local law enforcement agency after the warrant was executed. (Trans., Vol. I, page 107, lines 2-4) He agreed that the law enforcement presence at the initiation of the search warrant was significant. (Id., lines 5-8) He estimated the number of officers present to be at least twenty, and possibly up to thirty. (Id., lines 9-12)

Other than three or four, of the 20 to 30 officers, they all had guns, and some had multiple weapons on their person. (Id., lines 19-23) At least three assault weapons were utilized during the warrant execution. (Trans., Vol. I, page 108, lines 21-24) When asked if Mr. Chi was given an opportunity to get a coat prior to exiting the residence, Overhauser testified that he had no direct knowledge of Mr. Chi's treatment prior to his engagement in the interview. (Trans., Vol. I, page 109, lines 5-17) He didn't know how long Mr. Chi was held outside on the ledge or inside the garage, or the conditions within the garage. (Trans., Vol. I, pages 109-110, lines 18-4) Overhauser agreed the garage was basically guarded by law enforcement, and if anyone need to go to the bathroom, they were escorted by law enforcement. (Trans., Vol. I, page 110, lines 7-17) Overhauser was not aware of Mr. Chi being able to walk around or do anything in the in property prior to the interview. (Trans., Vol. I, page 111, lines 2-10) Prior to the interview, Overhauser did not have Mr. Chi his driver's license, and as far as he knew, Mr. Chit ***was not*** in possession of his driver's license at that time of the interview. (Trans., Vol. I, page 112, lines 11-16)

Overhauser recalled that his interview with Mr. Chi started a few moments after 12:20. (Trans., Vol. I, pages 112-113, lines 22-25) Overhauser agreed that he directed the location of the interview, and that he was "brought" back into the main residence. (Trans., Vol. I, page 114, lines 14-19) Overhauser didn't ask if he would come from the garage for the interview

in the presence of other people he was familiar with, but agreed Mr. Chi was brought into the residence. (Trans., Vol. I, pages 114-115, lines 20-1) Prior to the interview, Overhauser was unaware of Mr. Chi's education level. (Trans., Vol. I, page 115, lines 13-15) Overhauser agree that at the time that he engaged Mr. Chi in the interview, he believed Mr. Chi to be a suspect of a crime, the suspect who had received the package, and was one of the two main targets of the investigation. (Trans., Vol. I, page 116, lines 7-15) Overhauser agreed that the words EPA CID were not translated as depicted in the defense's Exhibit 3, as well as Agent Valezquez' position from OBN Narcotics. (Trans., Vol. I, pages 117-118, lines 24-5) During the interview, Overhauser directly confronted Mr. Chi about the package that had been delivered to the house and continued to ask questions regarding the evidence. (Trans., Vol. I, pages 118-119, lines 13-2) At some point during the interview, Overhauser agreed he specifically advised Mr. Chi that it was a crime to lie to federal officers. (Trans., Vol. I, page 119, lines 3-6) Overhauser testified in his experience, a suspect is an individual or entity that is believed to have committed the crime, and that subject/suspect are often interchangeable words. He also agreed that the term "target" would be another synonym for those words, and in his mind, subject, suspect, and target are all the same. (Trans., Vol. I, pages 125-126, lines 13-2) Ultimately, it was likely ***hours after the interview was conducted*** before Mr. Chi was allowed to exit the garage. (Trans., Vol. I, pages 129-130, lines 24-4)

3. **Christian Beals**

The defense first called Christian Beals, who on March 19, 2025, was employed by Superior Fire Alarm and he was tasked on that day to install a fire alarm system on a property in Seminole. (Trans., Vol. I, pages 133-134, lines 24-8) He was in Building B, and when he stepped outside to have a smoke break he realized there was law enforcement personnel waiting by the tree line. He observed tactical gear, a Kevlar vest, assault rifle, and a tan uniform. (Trans., Vol. I, page 134, lines 14-25) He testified that when he stepped outside for the smoke break, "before he realized it, the law enforcement personnel **was pointing the assault rifle at me** and explained to me don't move, stay where you are, let me see your hands, keep them where I can see them." (Trans., Vol. I, page 135, lines 9-13) He asked if he could bring coworker Joseph out, and asked to grab his jacket, which he was told, yeah, that's fine. (Id., lines 14-19) They were taken from Building B and they "*had us sit down on some railroad ties out front*." (Trans., Vol. I, page 136, lines 10-12) Their phones were taken at that time, and he confirmed the presence of law enforcement ***to make sure he wasn't leaving***. (Id. lines 17-22) He estimated being held there for maybe 45 minutes total. (Id. lines 23-25) He could not say who exactly was in charge, but did observe individuals that appeared to be Chinese, and **he did not see or hear any of the Chinese individuals speak in English to law enforcement**. (Trans., Vol. I, page 137, lines 8-16). When asked if he felt as if he was

free to leave, Mr. Beals' response was "not necessarily, no." (Id. lines 23-24) They were told they could leave shortly after receiving their personal artifacts back and that they were being temporarily detained. (Trans., Vol. I, page 138, lines 2-5) The Court inquired if Mr. Beals' heard anyone else tell anyone else that they were being temporarily detained, and he testified, "Not that I can recall." (Trans., Vol. I, page 143, lines 7-9)

4. **Joseph Christian Hull II**

The defense's next witness was Joseph Christian Hull, II. He was also employed by Superior Fire Alarm on March 19, 2025, and on that day he and Mr. Beals were assigned to install a fire alarm system at a property in Seminole. (Trans., Vol. I, pages 146-147, lines 21-4) He became aware of law enforcement presence while in Building B, when his coworker Christian, got his attention and he was asked to come outside of the building. (Trans., Vol. I, pages 147-148, lines 9-5) Once he came out of the building, he observed a law enforcement officer fully dressed in full tactical gear with an AR15, and as soon as he came out of the building, Mr. Hull was searched, with everything taken out of his pockets. Mr. Hull affirmed that yes, ***the AR15 had been pointed at him***. (Trans., Vol. I, page 148, lines 14-15) Mr. Hull testified that they took his cellphone, any tools that he had on him out of his pockets, and he kept them. (Trans., Vol. I, page 149, lines 7-9) He was escorted away from Building B, "*we were in front of the agent as he was directing us where to go*." (Id., lines 17-18) "*They sat us on a*

*ledge in front of the garage with everybody else*." (Id., lines 20-21) Mr. Hull testified that he thought there was "*more than five*" law enforcement around the area. (Trans., Vol. I, page 150, lines 7-13) When asked how long he was sitting on the ledge, Mr. Hull believed it could have been as long as ninety minutes. (Id., lines 14-19) During that entire time, he did not have access to his phone. (Trans., Vol. I, page 151, lines 1-3) He observed a female agent that he believed to be in charge at that time, and also observed individuals that appeared to be Chinese also sitting on the ledge. (Id., lines 4-9) ***He had no recollection of seeing or hearing any of the Chinese individuals speak English to the female officer***. (Id., lines 10-13) When asked if he felt free to go during the 90 minutes, Mr. Hull said, "No, at that time we were detained." (Id., lines 22-24) When ask why he thought or knew he was detained, Mr. Hull testified that the agents took everything---our cellphones, he was not allowed to call his boss and let him know what was going on until they were allowed to leave. (Trans., Vol. I, pages 152-153, lines 24-3) Mr. Hull testified that he felt like he could leave when "*the agents told them they could collect our materials and then ---that we could leave. They allowed us to go back to Building B, collect the rest of the fire alarm materials we had onsite, and then we were allowed to load everything up into the truck and leave*." (Trans., Vol. I, page 153, lines 9-13) He never heard law enforcement tell any of the Chinese people that they were free to leave. (Id., lines 20-22) According to Mr. Hull, when he arrived at the place where several people who appeared to be

Chinese were sitting, they were still bring people up as we were already sitting there. (Trans., Vol. I, page 154, lines 20-25) According to Mr. Hulls, there were some people handcuffed, but not everybody. (Trans., Vol. I, page 155, lines 12-13)

5. **Special Agent Sherita Holden**

The third witness called by the defense was Special Agent Sherita Holden, an employee of the EPA CID. (Trans., Vol. I, page 158, lines 13-15) She was involved in the execution of the search warrant in Seminole in March of 2025 (Id. lines 21-24) She was familiar with Agent Hubbard and agreed that he had the same training and experience on interviewing subjects and targets as she has had. (Trans., Vol. I, page 159, lines 18-21) Prior to the execution of the warrant, Holden recalled a meeting taking place at the OBN office the night prior. (Trans., Vol. I, page 160, lines 2-11) She agreed that there may have been as many as eleven EPA special agents at the scene during the warrant. (Id., lines 16-20) As the case agent, Holden agreed that it was Agent Hubbard's job to make sure that everybody was on the same page and knew what was going on. (Trans., Vol. I, page 161, lines 3-6) She recalled during the meeting at the OBN the night prior that Agent Hubbard had said that two main targets of the investigation had been identified. (Id., lines 10-13) Agent Holden acknowledged preparing a report as an officer involved in the investigation. (Trans., Vol. I, pages 161-162, lines 24-1) Holden then remembered that Agent Hubbard noted to her out of an abundance

of caution---that we had two potential targets, and out of an abundance of caution for those two, ***to read Miranda for the two***. (Trans., Vol. I, page 165, lines 13-16) Prior to the execution of the warrant, she was in possession of the EPA Miranda form as depicted in Exhibit 1. (Trans., Vol. I, page 166, line 2-9) Holden recognized defendant's exhibit 2 as a form provided by OBN Agent Robbins, who was there with her as a translator. (Id, lines 12-19) Holden agreed that there was a written *Miranda* waiver in Chinese at the scene that day. (Id., lines 20-22) She did provide the *Miranda* warning referenced in Exhibit 1 to Mr. Jiang. (Trans., Vol. I, page 167, lines 21-24) She started recording the conversation with Mr. Jiang before asking him if he would talk to her. (Trans., Vol. I, pages 167-168, lines 25-3) She did that because it is her practice, pursuant to her training and experience. (Trans., Vol. I, page 168, lines 4-8)

6. **OBN Agent Raquel Valezquez**

The fourth witness called by the defense was Raquel Valezquez. She is employed through the Oklahoma Bureau of Narcotics and has been for five years. (Trans., Vol. I, page 175, lines 8-13) She was present on March 19, 2025, to assist the EPA during the execution of a search warrant in Seminole, Oklahoma. (Id. lines 14-17) She was wearing her uniform which included a vest, duty belt, pants, and a shirt that says police on it. Her duty belt has handcuffs, a taser, two magazines (one 15 rounds; one 17 rounds), and Glock. (Trans., Vol.

I, pages 175-176, lines 25-9) The vest is bulletproof, and her weapon was on her leg holster, ***plainly visible***, as well as her handcuffs. (Trans., Vol. I, page 176, lines 15-24) She memorialized her part in a report, and it is customary for her to write a report the day after. (Trans., Vol. I, page 177, 3-5) She did recall subjects taken from the house and property and put on a retaining wall area of the house, and agreed they were there until the entire property was cleared, which could have taken a ***significant period of time***. (Trans., Vol. I, page 177, lines 11-17) She was one of three of four agents out in front of the property ***keeping watch on the subjects as they were in front of the property***. (Id., lines 18-23) ***They were all armed***. (Id., lines 24-25) Valezquez did not have any conversation with Mr. Chi; she did not tell him what was going on or that he was free to leave. (Trans., Vol. I, page 178, lines 1-6) At some point the individuals were taken from that area and taken to the garage, and when that occurred, there was law enforcement present to make sure they all stayed together and went where they were supposed to go. (Id., lines 7-14) The HSI agents kept watch over the people in the garage. (Id., lines 18-20) The HSI agents were inside the garage. (Trans., Vol. I, page 179, line 3) If Mr. Chi had wanted to go to the bathroom, he would have to have an escort. (Id., lines 13-15) ***She had no specific recollection of observing Mr. Chi to understand or speak English***. (Trans., Vol. I, page 180, lines 4-6) She didn't recall ever seeing the Mandarin speaking agent communicate with Mr. Chi. (Id., lines 10-15)

When Mr. Chi arrived in the area of the interview, she did not recall who was directed to get Mr. Chi or who brought him to the interview area, and did not know what was said to him in the garage to get him to the area. (Trans., Vol. I, page 181, lines 6-13) Agent Vazquez recognized government's Exhibit 42 as where the interview was conducted. (Trans., Vol. I, page 182, lines 1-4) She observed the white chair in Exhibit 42, the desk and printer to the left of the chair, and the floor in exhibit 42 appeared to be similar as in defendant's Exhibit 11. (Id., lines 8-18) She did not remember who directed Mr. Chi to sit down in the chair, and when asked why she was present during the interview, she testified, "*Just for secondary support, like* ***security***." (Id., lines 20-24) Security meant to her **to make sure agents were safe and Mr. Chi didn't go anywhere**. (Trans., Vol. I, page 183, lines 3-6) Looking at defendant's Exhibit 12, Vazquez acknowledged the blue tape accurately depicts where agents were standing during the interview. (Trans., Vol. I, page 183, lines 7-14) The agents were standing up, while Mr. Chi was sitting down. (Id., lines 15-18) When asked if she observed Agent Overhauser attempt to talk with Mr. Chi without a translator, she could not recall what was said, but knew that "there was a language barrier enough to where he had to call a translator on the phone." (Id., lines 19-23) Vazquez testified that Mr. Chi needed the assistance of a translator to understand the English language. (Trans., Vol. I, pages 183-184, lines 24-2) Before there was a translator on the phone, Vazquez testified there had been an "*attempt*" for

a conversation, but it was determined that there was a translator needed. (Trans., Vol. I, page 184, lines 19-23) During the interview, there was Agent Overhauser, her, Mr. Chi, and multiple agents walking throughout the area, walking in and out of the room. (Trans., Vol. I, page 185, 1-5) Vazquez acknowledged the presence of two additional chairs in the interview room that she identified as lawn chairs. (Trans., Vol. I, pages 186-187, lines 25-4) When asked if at any point during the interview the Defendant has asked to leave or terminate the interview if she would have stopped him, Vazquez answered, "***Yes***." (Trans., Vol. I, page 187, lines 14-17) When asked why, she elaborated, "***The interview was not concluded, so we would finish the interview with him.***" (Trans., Vol. I, pages 187-188, lines 23-2) At the conclusion of the interview, Mr. Chi went back to the garage area where everybody else was. (Trans., Vol. I, page 189, lines 5-7) She walked him back there. (Trans., Vol. I, page 189, lines 12-19) She did not recall how much longer Mr. Chi remained confined into the garage after the interview. (Trans., Vol. I, page 189, lines 21-25) She never saw him get his property returned to him. (Trans., Vol. I, page 190, lines 4-6)

7. **Jin Zhao Chi**

The final witness called during the Suppression Hearing was the defendant, Mr. Chi. Mr. Chi testified that he was born in Fujian in China. (Trans., Vol. II, page 203, lines 21-22) His native language is the Fuzhou dialect from China, which is different than Mandarin.

(Trans., Vol. II, page 204, lines 11-16) He can understand Mandarin. (Id., lines 17-18) As a child, he attended school with his highest grade completed the sixth. (Id., lines 19-22) Mr. Chi also has hearing difficulties that started at the age of forty, and it helps if people speak slower for him to hear. (Trans., Vol. II, page 205, lines 1-7) At the age of 23, he moved and came to America, and since coming to America, he learned some English working in restaurants, but the words were only restaurant related words, not much as all. (Id., lines 8-17) In English, Mr. Chi can only write his name, and can only speak very simple words, like restaurant and hi and okay. (Trans., Vol. II, page 206, lines 3-7)

On March 19, 2025, Mr. Chi was living in Seminole, Oklahoma, at a residential property with a house. (Id., lines 8-12) At some time late that morning, he because aware of law enforcement presence on the property. He was in his kitchen, there was glass he could see through, and he could see the front of his house. (Id., lines 13-19) Law enforcement came in the house without him letting them in, and they entered on their own. (Trans., Vol. II, pages 206-207, lines 20-1) He saw them in the kitchen, and they gave hand gesture that they wanted him to go to the front of the house. (Trans., Vol. II, page 207, lines 2-9) They had uniform, bulletproof vest holding weapons, "*the very long one, as well as pistols*." (Id., lines 10-15) When asked if they did anything with the weapons, Mr. Chi testified "*they pointed their guns at me*." (Id., lines 16-20) When asked if he did what they gestured him to do, Mr.

Chi said, yes. When asked why, Mr. Chi testified he was scared and that he didn't know what happened. (Id., lines 21-24) At that time, Mr. Chi could see seven or eight officers, and he went outside. (Trans., Vol. II, pages 207-208, lines 25-3) He saw seven or eight vehicles outside. He felt as if the property was surrounded "*because I saw a helicopter. Sorry. I misspoke. It was not a helicopter. It was a drone*." (Trans., Vol. II, page 208, lines 6-11) Once outside he was let to an area. (Id., lines 15-17) Before this happened, he had never been arrested before and had not had any real contact with American law enforcement. (Id., lines 18-23) Before being order outside, he was not given the opportunity to grab a coat, and it was very cold outside (Trans., Vol. II, pages 208-209, lines 24-3) (See also, defense Exhibit 4, which reflects that at approximately 12:00 p.m., the temperature on March 19, 2025, at the Seminole Municipal Airport was below 50°F) Once outside, Mr. Chi remembered there being two law enforcement officers in his area, and he was searched. His cellphone and driver's license were taken from him at that time. (Trans., Vol. II, page 209, lines 4-10) When asked if from the moment law enforcement arrived to the time when they took his belongings, if he felt like he could refuse any of their instructions, he answered "***I did not. I was scared***." (Trans., Vol. II, pages 209-210, lines 11-1) Law enforcement did not ever leave Mr. Chi alone in front of his property, and he did not feel like he could leave the area if he wanted to. (Trans., Vol. II, page 210, 3-15) Mr. Chi testified that at that time he did not speak to any law enforcement

officer in English, and the situation was not ever explained to him when he was in the front of the property. (Id., lines 17-23) Mr. Chi testified that he thought he might have been out there in the cold for approximately one hour and that he didn't have a watch or anything to tell time. (Trans., Vol. II, pages 210-211, lines 24-3) Mr. Chi identified defense Exhibit 14 as showing the position on the wall he was at in front of the property. (Trans., Vol. II, page 211, 15-17) Law enforcement was out there with him that entire time. (Id., lines 18-20) When he got there, a female officer told him, just sit there. (Id., lines 21-23) Eventually he was taken from that area to a garage, and after being taken to the garage, someone was standing outside the garage door. He never tried leaving the garage on his own because officers were at the garage door and they had weapons in their hands and on their belt and they got handcuffs as well. (Trans., Vol. II, page 212, lines 16-22) At some point he needed to go to the bathroom, and he asked, and the officer said that he would lead him there; he was escorted to the bathroom inside the house by a person that had a weapon, and then taken back to the garage. (Trans., Vol. II, pages 212-213, lines 23-11) At some point he was taken out of the garage by an officer and taken to an office where he was asked to sit on the chair or bench by hand gesture. (Trans., Vol. II, page 213, lines 12-23) Mr. Chi reviewed defense Exhibits 11, 12, and 13, and identified the chair he was directed to sit in in Exhibit 11, and testified the blue marks in Exhibit 12 represented where the three officers were standing, and the

additional blue mark in Exhibit 13 represented another officer that came in and was there. (Trans., Vol. II, page 214, lines 3-14) In describing how he felt when he was seated in the chair, Mr. Chi testified "***I was very frightened. I felt I was suppressed with the four officers standing behind me***." (Id., lines 15-21) Mr. Chi indicated that while in the chair, he did not speak to anyone face-to-face in Mandarin, and that they were initially speaking to him in English. (Trans., Vol. II, pages 214-215, lines 23-2) He could not understand what the officers were saying at that time. (Trans., Vol. II, page 215, lines 3-5) He did see them call someone on the phone for an interpreter, and understood some, but there were some things he didn't understand as it was very noisy. (Id. lines 6-12) Before answering questions, he did not recall being told through the interpreter that they were conducting a criminal investigation, or that he was the subject of the search warrant. (Id., lines 13-19) Before answering their questions, he was not given his phone or ID back, nor was he told he was free to not be in the office with the law enforcement officers. (Trans., Vol. II, pages 215-216, lines 20-2) He was never told that he wasn't under arrest. (Trans., Vol. II, page 216, lines 3-4) Mr. Chi testified that he answered the questions asked by the law enforcement officer because he was scared. "*With so many officers there, I wondered if I refused to answer, would the take me*." (Id., lines 8-10) He was directed during the questioning to give the password to his phone, and he did not feel like he could refuse to give them that information. (Id., lines 11-21) Mr.

Chi further testified that during that day he did see people in handcuffs; they were in the garage with him. (Trans., Vol. II, page 217, lines 11-15)

On cross examination, Mr. Chi continued to deny understanding the English language and indicated that he pointed to female agent and "basically tried to say the female, was very, very cold. She needed a coat." (Trans., Vol. II, page 218, lines 8- 17). He denied telling her specifically where to go in the house to find the coats. (Id., lines 18-20) Mr. Chi did not understand what they were talking to him in English before the interview started with the interpreter. (Trans., Vol. II, page 219, lines 1-11) He felt as though Overhauser's testimony that he agreed to talk to him in English was a lie as well. (Id., lines 12-17) Mr. Chi agreed that at "no point" did he understand English, and that he "have been always requesting that I needed an interpreter." (Trans., Vol. II, pages 219-220, lines 18-1) He requested an interpreter in English, saying "*I don't know English. I want Chinese*." (Trans., Vol. II, page 220, lines 2-7) When asked if he answered any questions by law enforcement in English, Mr. Chi testified in the negative, "*What I could have said was merely something like okay, I don't know*." (Id., lines 15-19) Mr. Chi denied there being "any moment" in the interview when he was asked a question and he responded before it was translated. (Id., lines 20-25) Mr. Chi agreed the only time a gun was pointed at him was when law enforcement came into the residence for a matter of seconds. (Trans., Vol. II, page 221, lines 1-11) Mr. Chi did agree

the law enforcement officers were courteous and polite in asking him to go outside. (Id. lines 15-18) He was led to the office first, and then he was led to go out because there were officers outside as well. (Trans., Vol. II, page 222, lines 3-5) Once outside, there was a pat down of his body by the courteous and polite officers. (Id., lines 21-23) Mr. Chi denied a coat was retrieved for him while outside. (Trans., Vol. II, page 223, lines 5-8)[1] Mr. Chi continued that "*it was Ms. Zheng who said she was extremely cold, therefore he pointed to my (inaudible) to the officer and ….uh, I, uh…I indicated that she was shivering, she was cold. Then the officer went inside to get the coat for her.*" (Trans., Vol. II, pages 223-224, lines 23-1) Law enforcement officers were "polite and courteous" in asking him to go to the garage, while he was in the garage, and by allowing him to go to the restroom. (Trans., Vol. II, pages 224-225, lines 20-4) There were also "polite and courteous" going from the garage to the interview room. (Trans., Vol. II, pages 225-226, lines 22-2) It was at the request of the law enforcement officers to be in the specific room for the interview, and he could not refuse that. (Trans., Vol. II, page 227, lines 10-12) Mr. Chi agreed that that they did not point guns at him, and it began with two officers and then a third participated. (Trans., Vol. II, pages 227-228, lines 21-3) The officers were "polite and courteous" during the entire time, and never threatened,

1 In Government's Exhibit 5 wherein Mr. Chi is depicted outside, he is not wearing a coat; Exhibit 11, depicting the female with "Zheng" written on the form, she does appear to be wearing an outer garment with collar.

but he was "*scared inside my own heart*" (Trans., Vol. II, pages 228-229, lines 18-2)

Mr. Chi acknowledged that he was not ever "told" that he had to talk to law enforcement or ever specifically told that he couldn't leave. (Trans., Vol. II, page 230, lines 10-20) After the interview he was not let go and free, but was then sent to the garage by them. (Trans., Vol. II, pages 230-231, lines 21-1) Mr. Chi agreed that he was not arrested. (Trans., Vol. II, page 231, lines 2-3) The two individual that were arrested were Hispanic individuals that fled the scene. (Id., lines 21-23). After having a gun pointed at him, law enforcement did not have to drag him out of the house, "*No, they didn't have to do that. They just pointed out and then just pointed outside*." (Trans., Vol. II, page 232, lines 12-15) They didn't have to drag him outside because they asked him to go outside, and he followed their instructions. (Id., lines 16-19) The law enforcement officers were never friendly or smiling at him. (Id., lines 20-22)

**SUPPLEMENTAL ARGUMENTS & AUTHORITIES**

The Fifth Amendment privilege against self-incrimination declares that, "No person…shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. The Fifth Amendment also guarantees due process of law, and one element of due process is a defendant's right not to have an involuntary confession

introduced against him at trial. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).

I. Applicability of *Miranda* Rights

In *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), the Supreme Court declared that *Miranda* is a constitutional rule that protects the Fifth Amendment Privilege against Self Incrimination. The privilege serves to protect persons in all settings in which their freedom of action is curtailed from being compelled to incriminate themselves. *Pennsylvania v. Muniz*, 4996 U.S, 582, (1990); *Rhode Island v. Innis*, 446 U.S, 291, 297 (1980).

II. Custody

Miranda warnings are to be given to individuals who are subjected to custodial interrogation by government agents. *Miranda* at 436. The Court found that that the interplay of custody and government interrogation is so inherently coercive that *Miranda* warnings are necessary to protect the suspect's privilege against self-incrimination. *Miranda* at 458. In the case at bar, the evidence is that was that at 11:09 a.m. Mr. Chi was confronted in his home by 20-30 officers coming onto his property, and he had a gun pointed at him[2]. He observed a drone outside, and directed to a specific location were he was physically patted down. His belongings including his phone and identification were taken from him. He was photographed with an identification sheet, subjected to a lengthy pre-interrogation detention

2 Which is consistent with the sworn testimony of Beals and Huff II.

in the cold and then in a garage. His photograph with an identification sheet was taken a second time; and then he was taken from an area with other, taken to another area, and then subjected to antagonistic and lengthy questioning in the close presence of three officers standing over him. The interrogation was persistent, involved leading questions and discounted his denials of knowledge, and by Agent Valezquez' own admission, he was not free to leave during the interrogation, and she would have stopped him if he had made any attempts to do so. After his interrogation, he continued to be held without receiving his belongings for several hours.

A. The Meaning of Custody

The inquiry of defining 'custody' is fact specific and for purposes of *Miranda*, a suspect is in "custody" "as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)(quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). To determine if an individual was in "custody" at the time of the interrogation, "a court must examine all of the circumstances surrounding the interrogation," *Stansbury v. California*, 511 U.S. 318, 322 (1994) and analyze "how a reasonable man in the suspect's shoes would have understood his situation." (Id. at 324) Custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (Id. at 323) The Tenth Circuit

has recognized a number of non-exhaustive factors in determined whether a custodial interrogation has taken place: (i) the degree to which the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect. *United States v. Jones,* 523 F.3d 1235, 1240 (10th Cir. 2008) Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request if compulsory. (*Jones* at 1240)

In *United States v. Mahmood*, 415 F. Supp. 2d 13, 17-18 (D. Mass. 2006), the court found that the defendant was in custody even though he was questioned at home, because the defendant was isolated and questioned by 3 agents in a harsh and accusatory tone and was never told he was free to leave. Additionally, the agents "blocked the defendant's access to a phone" and "required him to remain within view during the search of the premises." In *United States v. Kim*, 292 F.3d 969 (2002), the 9th Circuit affirmed a suppression ruling by the district court where the defendant moved to suppress incriminating statements made during

the execution of a search warrant at her store. The district court found that officers knew the defendant was Korean and may have difficulty in comprehending English. The Court found that (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual, to all be relevant factors in deciding the custodial question. See also *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir.2001)

The Court must consider the circumstance surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others. (*Id.*) Like the defendant in *Kim*, Mr. Chi did not willingly agree to submit to an encounter with the police. Rather, his house was surrounded and swarmed by a multitude of armed officers who entered his house without knocking, pointed a gun at him, and ordered him to go outside in the cold where he was monitored for no less than 45 minutes, and then taken to another enclosed area, escorted to the bathroom in his own house, before finally being taken to the interrogation room, isolated away from anyone familiar, and then questioned by three armed officers. It is undisputed that officers restricted the defendant's and other occupants' movements during the execution of the warrant **for hours**. The coercive impact of enforced isolation is particularly strong where the defendant "may have had some difficulty in

understanding English." *United States v. Beraun-Panez*, 812 F.2d 578, 581 (9th Cir. 1987) Just like in *Kim*, the interrogation of Mr. Chi was a full-fledged interrogation, and not a brief inquiry. Not only had Mr. Chi been restricted of his movements from the time they entered the property at 11:09 a.m. until the interrogation began at 12:22 p.m. that lasted for 46 minutes, he continued to be restricted for several more hours after the interrogation. According to all of the agents' testimony, Mr. Chi was a target/subject/suspect, and the questions that covered in detail his suspected activities, could have only reinforced the impression that Mr. Chi was indeed a suspect. Given the overall length and manner of the questioning, both before and after an interpreter was put on the phone, supports the conclusion that Mr. Chi was "in custody."

B. The Objective Standard for Custody

In the Fourth Amendment context, the Court in *United States v. Recalde*, 761 F.2d 1448, 1454 (10th Cir. 1985) found that the defendant, a resident alien, reasonably could have felt unable to terminate his encounter with police officers due to his Argentine background and cultural acquiescence to authority. In *Recalde*, the defendant was in the presence of only two uniformed officers, and his vehicle and luggage had already been searched. The officers had not returned the defendant's driver's license and vehicle registration. The defendant was never told he was free to go, and like Mr. Chi, he testified that he did not feel free to leave. Like the

defendant in *Recalde*, Mr. Chie could reasonably have felt constrained and unable to simply terminate the confrontation with Overhouser, Velasquez and then additionally Hubbard. Mr. Chi gave undisputed testimony that he was scared by the police actions and authority, which is certainly relevant to the issue of coercion. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) and *United States v. Mendenhall*, 4456 U.S. 544, 558 (1980).

III. Interrogation

Interrogation under *Miranda* encompasses "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The Court has defined "functional equivalent" as "any words or actins on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." To determine whether interrogation has occurred, courts may consider the intent of the police, but the focus should be "primarily upon the perceptions of the suspect." (*Id.*, at 301, 302 n. 7) In *United States v. Khan*, 324 F.Supp.2d 1177, 1189-90 (D.Colo. 2004), the court found that when a subject was a possible target of a criminal conspiracy investigation, the questioning constituted "interrogation" and because the agents knew during their questioning of the subject that the information the subject provided them could result in the subject's criminal prosecution, the Fifth Amendment privilege against self-incrimination applied. The *Khan* court found that the *Miranda* requirement applies to all custodial interrogations where

criminal prosecution *could* result, even if the interrogation is administrative in nature. *Id.* at 1189. (emphasis in original) In *Khan*, the court was convinced that the agents knew during their interrogations of the defendant that the information he provided them could result in his criminal prosecution. The same could easily be said of Overhauser and Hubbard of their interrogation of Mr. Chi. The Court in *Oregon v. Elstad*, 470 U.S, 298 (1985) defines a voluntary statement as one given absent the pressure of "techniques and methods used by law enforcement that are "offensive to due process," or under circumstance in which the suspect clearly had an opportunity to exercise "a free and unconstrained will." *Elstad* at 304.

IV. Warnings

While the government concedes that no *Miranda* warning was given to Mr. Chi, the government has presented testimony that Mr. Chi "agreed" to answer Agent Overhauser's questions. It is clear that Mr. Chi did, in fact, answer questions posed to him, but the fact that Mr. Chi answered questions does not negate the fact that he was in a custodial setting at the time of the questioning and that he was not provided any warning against self-incrimination. Mr. Chi was not told that he didn't have to speak to police or that his statements could be used against him.

## CONCLUSION

In conclusion, at 12:22 p.m., Mr. Chi was in the custody of the agents that arrived to

search his house pursuant to the search warrant in which he was a known target. He was not apprised of his Fifth Amendment rights; Mr. Chi did not knowingly, intelligently, and voluntarily waive those rights. The totality of the circumstances surrounding the interrogation reveal a coerced atmosphere and that Mr. Chi possessed no level of comprehension that he had a right to remain silent. As a known suspect of the alleged criminal activity, Mr. Chi was not "made aware of the dangers and disadvantages…so that the records will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed. 562 (1975). *U.S. v. Burson*, 531 F.3d 1254, 1257 (10th Cir. 2008).

The statements made by Mr. Chi when being questioned by law enforcement on March 19, 2025, and the fruits thereof, including the download of his phone by his providing the password, ought to be suppressed at trial.

Respectfully Submitted,

s/Marna Franklin
Marna Franklin,
Attorney at Law
620 N. Robinson, Suite 203
Oklahoma City, OK 73102
(405) 239-2454 Telephone
(405) 313-0610 Cell
mfranklin@demandproof.com

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2026, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants appearing in this case.

s/Marna Franklin

Marna Franklin